IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
September 7, 2022 Session

**STATE OF TENNESSEE v. MARCUS DAVIS**

**Appeal from the Criminal Court for Shelby County**
**No. 20-1242  J. Robert Carter, Jr., Judge**

_____

**No. W2021-01147-CCA-R3-CD**

_____

The Defendant, Marcus Davis, was convicted by a Shelby County Criminal Court jury of attempted first degree premeditated murder, a Class A felony, and employing a firearm during the attempt to commit a dangerous felony, a Class C felony, and was sentenced by the trial court to an effective term of twenty-one years in the Department of Correction. On appeal, he argues that the evidence is insufficient to show premeditation and that the trial court erred by denying his request for a jury instruction on self-defense. Based on our review, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

JOHN W. CAMPBELL, SR., J., delivered the opinion of the court, in which J. ROSS DYER and JILL BARTEE AYERS, JJ., joined.

Michael E. Scholl, Memphis, Tennessee (on appeal) and Terrance Rand, Nashville, Tennessee, and Larry Sims and Kim Sims, Memphis, Tennessee (at trial), for the appellant, Marcus Davis.

Herbert H. Slatery III, Attorney General and Reporter; Jonathan H. Wardle, Assistant Attorney General; Amy P. Weirich, District Attorney General; and Brad Reasoner and Neil Umsted, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**FACTS**

This case arises out of the Defendant's October 18, 2019, shooting of his Memphis "Bimbo Bakeries" co-worker, Cordell Jeffries, during an altercation in the warehouse of

the business.  According to the State's proof at trial, the Defendant shot the unarmed victim in the chest as the victim was backing away from the Defendant during a fist fight.  As the victim was fleeing, the Defendant shot him a second time in the arm.  Afterwards, the Defendant calmly exited the warehouse, never again to return to work.  Approximately ten days later, the Defendant turned himself into the police.  The Shelby County Grand Jury subsequently indicted the Defendant with attempted first degree premeditated murder and employing a firearm during the commission of or attempt to commit a dangerous felony.

At the July 12-14, 2021 trial, Memphis Police Department ("MPD") Officer Jazmine Tolbert testified that at approximately 2:00 or 2:30 p.m. on October 18, 2019, she responded to a report of a shooting at the Bimbo Bakeries.  When she arrived, she saw a blood trail leading to the break room in which the victim was sitting.  The victim had been shot twice - - once in the chest and once in the arm.  After talking to the victim, she went to the warehouse, where she found a shell casing.  Although she and fellow officers canvassed the area, they were unable to locate any additional shell casings.  On cross-examination, she agreed that there would be two shell casings if the victim had been shot twice.

The victim testified that he had been employed with Bimbo Bakeries for nine or ten years and had worked his way up to "team lead," a job in which he was required "to direct and distribute bread around Memphis and to direct the guys on what to do."  He had worked for approximately eight months with the Defendant, whose job was "to load bread into baskets and distribute amongst the route."  He and the Defendant originally had a good working relationship but began having work-related conflicts after he corrected the Defendant about the Defendant's work not "being done properly[.]"  Although he and the Defendant had work-related conflicts, they never had any personal conflict and, prior to the day of the shooting, had never been in a physical altercation.

The victim testified that, up until two days before the shooting, he had been off work for two weeks following the death of this mother.  During the time he was off work, the Defendant brought flowers to his mother's wake.  When he arrived at work on the day of the shooting, the Defendant told him that he wanted to talk to him about something, so the victim followed the Defendant into an area of the warehouse behind some trays of cakes.  The victim identified the surveillance tape of the shooting, which was published to the jury and subsequently admitted as an exhibit.  He said the location of the warehouse's surveillance cameras was common knowledge among the employees of the bakery.  He stated that during the portion of the surveillance tape in which he followed the Defendant out of camera view, the Defendant struck him with his fist.  The victim said he began backing away, as reflected on the surveillance tape.  The Defendant charged him, and the victim reacted by striking the Defendant twice with his fist.  The Defendant then pulled out a gun and shot the victim in the chest.

The victim testified that he tried to escape and that the Defendant attempted to shoot him again. The victim agreed that the surveillance tape reflected that the Defendant dropped his gun, that the victim ran from the Defendant, that the Defendant picked the gun up and aimed it at him as he was fleeing, and that the Defendant then calmly walked out of the warehouse. The victim stated that the Defendant fired a total of two or three shots at him. At the request of the prosecutor, the victim displayed the scars on his chest and arm from his gunshot wounds. The victim said the bullet that struck his chest remained lodged in his body, and that the bullet that struck his arm passed all the way through, leaving scars on both sides of his arm from the entrance and exit wounds. The victim stated that he never had a gun or any other kind of weapon and that he hit the Defendant only with his fist. The victim also stated that it was against company policy to bring a gun to the facility and that there were signs in the workplace reflecting that policy.

On cross-examination, the victim testified that it was his employer who purchased the flowers for his mother's wake; the Defendant merely delivered the flowers on behalf of the employer. The victim said that the Defendant had threatened him in the past at work, that they had work meetings to address those threats, and that his employer responded by scheduling the Defendant to work a different shift. Later in his cross-examination testimony, the victim testified that the Defendant had threatened to kill him, both before and after he brought flowers to the victim's mother's wake. The victim said that he and the Defendant did not discuss anything before the Defendant initiated the fist fight. The Defendant told him only that he wanted to discuss something with him. When he followed the Defendant into the warehouse behind the cake trays, the Defendant turned around and "sucker punched" him.

The victim insisted that he had no idea why the Defendant sucker punched him. He repeated that his only prior conflict with the Defendant had been work-related, caused by his having complained about the Defendant's leaving early for his break and not completing his work assignments. The victim denied that his separate injuries could have been caused by a single bullet that passed through his arm into his chest, testifying that he felt the impact of a bullet in his chest before he felt the impact to his arm. He stated that he had never before seen the Defendant with a gun and that the first time he saw the gun that day was when the Defendant pulled it out of his pocket and shot him.

MPD Detective Alfreda Harper testified on direct and redirect examination that police officers discovered one shell casing "over in the bread in the racks." She said they canvassed the area but never found any additional casings. She stated that it was possible there were other casings that were not recovered because if a shell casing hit the concrete warehouse floor it could have gone "anywhere[.]" She said an employee named Cedric Duckett was at the scene when the altercation started but did not provide any useful

information.  She stated that she swore out a warrant for the Defendant's arrest on October 21, 2019.

On cross-examination, Detective Harper testified that she based the charges against the Defendant on the victim's statement and her viewing of the surveillance tape, which appeared to her to show that the Defendant fired at the victim twice -- first after holding his gun up to the victim's face, and then again as the victim was fleeing.  She acknowledged that she did not know which man initiated the confrontation.  In response to a question from the trial court, she testified that she and other officers moved what they could in their search for shell casings but that the warehouse was very cluttered.

As its final proof, the State introduced the parties' stipulation that the Defendant turned himself into the Shelby County Sheriff's Office Fugitive Division on October 30, 2019.

The Defendant testified that the victim was a long-time employee of Bimbo Bakeries who helped train new employees, but that he was never the Defendant's supervisor and never held the title of "team lead."  He said the victim became jealous of him after "a . . . new big boss . . . grew [a] liking to [the Defendant]" and the Defendant was made a permanent employee.  He testified that the victim was constantly grumbling about him and continually "throwing his signs" at him.  He denied that he ever threatened to kill the victim.

The Defendant testified that on the day before the shooting, he and Mr. Duckett had completed their work and were outside when the victim, who worked the second shift, arrived at the bakery.  The Defendant explained that he had been forced to work later that day because the delivery truck arrived late.  He stated that when he attempted to clock out at 9:00 p.m., he learned that the victim had clocked him out early.  The Defendant said that he reported the victim's actions to his supervisor, but he did not know what steps, if any, the supervisor took to address his complaint.

The next day, the victim arrived early before the victim's shift was scheduled to start.  The victim was in an "uprage, hollering what he gone [sic] do, people got him effed up, all of this, and all of that."  The Defendant stated that he was walking away from the victim and did not know that the victim was following him.  He then noticed Mr. Duckett "looking like someone would hide," so he started to turn around.  Before he could turn, the victim hit him "[a]nd that's when the altercation started."  The Defendant stated that he responded to the victim's blows by reaching for his gun, which he regularly carried, and firing one shot.  He denied that it was against company policy to have a gun at the workplace or that there were any signs prohibiting guns.  He did not recall firing more than one shot and said that he discharged his weapon because he felt threatened when the victim

- 4 -

struck him a hard blow with what felt like an object. He denied that he had any intent to kill the victim and said that his only intention was to get the victim off of him.

On cross-examination, the Defendant acknowledged that the surveillance video showed that he turned around at one point to look at the victim as the victim was following him into the warehouse. He said, however, that he did not know that the victim was continuing to follow him. He acknowledged that the video showed that the victim was backing away from him before he fired his gun. He admitted that the victim never pulled a gun on him and that he never saw an object in the victim's hands. He conceded that the victim was "off of [him]" before he fired his gun, that the victim ran toward the door, that he pursued the victim, that he dropped his gun, and that he picked the gun back up. He denied that he fired a second shot at the victim, despite the surveillance video's appearing to show him aiming the weapon at the fleeing victim. Finally, he acknowledged that he calmly walked out of the warehouse, that he never returned to work, and that he did not contact the police, go to the hospital for treatment of any injury, or turn himself in until October 30.

The jury convicted the Defendant of the indicted offenses, and the trial court sentenced him to an effective term of twenty-one years in the Department of Correction. Following the denial of his motion for new trial, the Defendant filed an appeal to this court in which he challenges the sufficiency of the evidence in support of his conviction for attempted first degree premeditated murder and argues that the trial court erred by not instructing the jury on self-defense.

## ANALYSIS

### I. Sufficiency of the Evidence

The Defendant first contends that the evidence is insufficient to sustain his conviction for attempted first degree murder because there was insufficient proof that he acted with premeditation. He asserts that the evidence showed that the victim aggressively followed him while armed with a blunt object, that he did not draw his gun until after the victim punched him at least twice, that he made no declarations of an intent to kill the victim and no attempts to conceal the crime, and that he did not procure his weapon for the sole reason of killing the victim. The State responds that the evidence, viewed in the light most favorable to the State, was more than sufficient to show that the Defendant acted with premeditation. We agree with the State.

When the sufficiency of the evidence is challenged on appeal, the relevant question of the reviewing court is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the

crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see also* Tenn. R. App. P. 13(e) ("Findings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt."); *State v. Evans*, 838 S.W.2d 185, 190-92 (Tenn. 1992); *State v. Anderson*, 835 S.W.2d 600, 604 (Tenn. Crim. App. 1992).

Therefore, on appeal, the State is entitled to the strongest legitimate view of the evidence and all reasonable inferences that may be drawn from it. *See State v. Williams*, 657 S.W.2d 405, 410 (Tenn. 1983). All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact. *See State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990). "A jury conviction removes the presumption of innocence with which a defendant is initially cloaked and replaces it with one of guilt, so that on appeal a convicted defendant has the burden of demonstrating that the evidence is insufficient." *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

The guilt of a defendant, including any fact required to be proven, may be predicated upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *See State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999). The standard of review for the sufficiency of the evidence is the same whether the conviction is based on direct or circumstantial evidence or a combination of the two. *See State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011).

For the purposes of this case, first degree premeditated murder is defined as "[a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202 (2018). Criminal Attempt occurs when a person who, "acting with the kind of culpability otherwise required for the offense . . . [a]cts with intent to cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part[.]" *Id.* at § 39-12-101(a).

Premeditation requires that the act be "done after the exercise of reflection and judgment" and committed when the accused "was sufficiently free from excitement and passion as to be capable of premeditation." *Id.* at § 39-13-202(d). Whether premeditation exists is a factual question for the jury to determine from all the evidence, including the circumstances surrounding the killing. *State v. Davidson*, 121 S.W.3d 600, 614 (Tenn. 2003). Our supreme court has provided a non-exclusive list of factors from which a jury may infer premeditation, including the defendant's declarations of an intent to kill, evidence of the procurement of a weapon, the defendant's use of a weapon on an unarmed victim, the particular cruelty of the killing, evidence of the infliction of multiple wounds, the defendant's preparation before the killing to conceal the crime, destruction or secretion of evidence after the killing, and the defendant's calmness immediately after the killing.

*State v. Nichols*, 24 S.W.3d 297, 302 (Tenn. 2000). Additional evidence from which a jury may infer premeditation is establishment of a motive for the killing. *State v. Leach*, 148 S.W.3d 42, 54 (Tenn. 2004).

Viewed in the light most favorable to the State, the evidence established that the Defendant and the victim had work-related conflicts, that the two men did not get along, and that the Defendant had threatened in the past to kill the victim. The evidence further established that on the day of the shooting, the Defendant, who was angry at the victim's having clocked him out early the previous day, asked the victim to follow him into the warehouse and then "sucker-punched" him when the two were out of camera view behind the tray of cakes. When the victim fought back, the Defendant pulled out his gun and shot the victim in the chest as the victim was backing away. The Defendant dropped the gun, but retrieved it and shot the victim again as the victim was fleeing from the warehouse. The Defendant then calmly exited the warehouse.

The Defendant asserts that the surveillance tape shows that the victim was carrying an object in his hand as he followed the Defendant into the warehouse. He further asserts that the single shell casing demonstrates that the Defendant fired only one shot at the victim in an effort to get the victim off him during the course of their fist fight. We have reviewed the surveillance tape and cannot discern whether there is any object in the victim's hand. What is clearly visible on the tape, however, is the Defendant's actions in picking up the dropped gun and aiming it at the fleeing victim. The surveillance tape has no sound, but the Defendant's stance with his gun arm extended toward the fleeing victim is consistent with the victim's account of having been shot first in the chest and a second time in the arm as he attempted to run away. Moreover, although only a single shell casing was recovered from the scene, the police detective explained that the warehouse was very cluttered and that a shell casing could have gone anywhere. From all the evidence, a rational jury could have reasonably found that the Defendant acted with premeditation in his shooting of the victim. We, therefore, conclude that the evidence is sufficient to sustain the Defendant's conviction for attempted first degree premeditated murder.

## II. Self-Defense Instruction

The Defendant next contends that the trial court erred by not instructing the jury on self-defense, arguing that self-defense was fairly raised by his testimony that the victim struck him in the back with a blunt object. The State argues that the trial court properly found that the proof did not warrant an instruction on self-defense. We, again, agree with the State.

It is well-settled in Tennessee that a defendant has a right to a correct and complete charge of the law so that each issue of fact raised by the evidence will be submitted to the

jury on proper instructions." *State v. Farner*, 66 S.W.3d 188, 204 (Tenn. 2001) (citations omitted). Accordingly, trial courts have the duty to give "a complete charge of the law applicable to the facts of the case." *State v. Davenport*, 973 S.W.2d 283, 287 (Tenn. Crim. App. 1998) (citing *State v. Harbison*, 704 S.W.2d 314, 319 (Tenn. 1986)). Because the propriety of jury instructions is a mixed question of law and fact, the standard of review is de novo with no presumption of correctness. *State v. Benson,* 600 S.W.3d 902 (Tenn. 2020) (citations omitted).

Self-defense "need not be submitted to the jury unless it is 'fairly raised by the proof.'" *State v. Hawkins*, 406 S.W.3d 121, 129 (Tenn. 2013) (quoting Tenn. Code Ann. § 39-11-203(c) (2010)). "The quantum of proof necessary to fairly raise a general defense is less than that required to establish a proposition by a preponderance of the evidence." *Id.* In order "[t]o determine whether a general defense has been fairly raised by the proof, a court must consider the evidence in the light most favorable to the defendant and draw all reasonable inferences in the defendant's favor." *Id.* "If a general defense is found to be fairly raised by the proof, the trial court must submit the defense to the jury and the burden shifts to the prosecution to prove beyond a reasonable doubt that the defense does not apply. *Benson*, 600 S.W.3d at 903 (citing *State v. Perrier*, 536 S.W.3d 388, 401 (Tenn.2017)).

Under our self-defense statute, the following conditions must be met for a person to be justified in using deadly force in Tennessee:

> (A) The person has a reasonable belief that there is an imminent danger of death or serious bodily injury;
>
> (B) The danger creating the belief of imminent death or serious bodily injury is real, or honestly believed to be real at the time; and
>
> (C) The belief of danger is founded upon reasonable grounds.

Tenn. Code Ann. § 39-11-611(b)(1), (2).

The trial court denied the Defendant's request for a self-defense instruction on the basis that self-defense was not fairly raised by the proof at trial. We find no error in the trial court's ruling. Even if the victim was armed with a blunt object and was the one who struck the first blow, the proof showed that the Defendant did not fire his first shot until the victim was backing away from him. The proof further showed that the Defendant picked up his dropped gun and fired his second shot as the victim was fleeing out of the warehouse. There was no evidence that the victim ever had a weapon of any type or that

the Defendant sustained any injury, much less serious bodily injury, from the victim's blows.

The Defendant attempts to distinguish his case from *Benson*, which the trial court cited in its ruling, by pointing out that, unlike the defendant in Benson, he offered testimony that he felt threatened with serious bodily injury when he shot the victim. However, as in *Benson*, "[a]t most, the defense proof fairly raised the issue of whether the defendant was justified in using non-lethal force to protect himself from the victim." 600 S.W.3d at 907. Although the Defendant testified that it felt as if the Defendant hit him with an object, he acknowledged that he never saw an object in the victim's hands. Moreover, as discussed above, the evidence was that the Defendant fired his gun after the victim was already backing away from him. We, therefore, conclude that the trial court did not err in refusing the Defendant's requested instruction on self-defense.

## CONCLUSION

Based on our review of the record and analysis of the applicable law, we affirm the judgments of the trial court.

_____
JOHN W. CAMPBELL, SR., JUDGE

- 9 -